Chad L. Schexnayder (No. 009832)
E-Mail: cls@jhc-law.com
Travis A. Pacheco (No. 026337)
E-Mail: tap@jhc-law.com
JENNINGS, HAUG & CUNNINGHAM, L.L.P.
2800 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-1049
Telephone: 602-234-7800
Facsimile: 602-277-5595

Thomas R. Kline
E-Mail: Tom.Kline@klinespecter.com
David J. Caputo
E-Mail: David.Caputo@klinespecter.com
David C. Williams
E-Mail: David.Williams@klinespecter.com
KLINE & SPECTER
1525 Locust Street, Nineteenth Floor
Philadelphia, Pennsylvania 19102
Telephone: 215-772-1000

Joseph Trautwein
E-Mail: jtrautwein@cpmiteam.com
JOSEPH TRAUTWEIN & ASSOCIATES, LLC
17 Auchy Road
Erdenheim, Pennsylvania 19038
Telephone: 215-764-230-1

Attorneys for Plaintiff Relator

**CIV11-721  TUC FRZ**

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JACQUELINE BLOINK,<br><br>              Plaintiff,<br><br>vs.<br><br>CARONDELET HEALTH NETWORK; CARONDELET HEALTH NETWORK t/a and/or d/b/a ST. MARY'S HOSPITAL; and CARONDELET HEALTH NETWORK t/a and/or d/b/a ST. JOSEPH'S HOSPITAL,<br>              Defendants. | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 AND LOCAL CIVIL RULE 5.7<br><br><br>COMPLAINT<br><br><br><br>JURY TRIAL DEMANDED |

FILED
RECEIVED
LODGED
COPY

NOV 15 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Plaintiff-Relator Jacqueline Bloink ("Relator" or "Bloink"), by and through her undersigned attorneys and on behalf of the United States of America, alleges as follows:

## I.     INTRODUCTION

1.     This action arises under the provisions of Title 31 U.S.C. §§ 3729 *et seq.*, known as the False Claims Act ("FCA").

2.     This case is brought pursuant to the *qui tam* provisions of the FCA to recover treble damages and civil penalties on behalf of the United States of America arising from false or fraudulent claims for reimbursements for Inpatient Rehabilitation Facility ("IRF") services that were submitted or caused to be submitted by Defendants to Medicare.

3.     The suit involves the following course of conduct:  From 2008 to 2011, Carondelet Health Network knowingly caused the submission of false claims for payment for Inpatient Rehabilitation Facility services because it failed to meet rehabilitation therapy time requirements and failed to perform other services (preadmission screening, plan of care documentation, team conference meeting documentation) as required by Medicare.

## II.     JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732.

5.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside, or transact business in this District.   In addition, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District.

6.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. §§ 3729 and 3730 occurred in this District.

## III.    THE PARTIES

7.    Relator Jacqueline Bloink is an individual citizen of Arizona and is a Certified Professional Coder-Instructor by the Academy of Professional Coders, and a Certified Medical Reimbursement Specialist.  Bloink was employed by Carondelet Health Network from June 2010 to June 29, 2011 as a Corporate Responsibility Coordinator.

8.    Relator has direct and independent knowledge on which the allegations are based, is an original source of this information to the United States, and has voluntarily provided the information to the United States before filing this action based on the information.

9.    This suit is not based on prior public disclosures of allegations or transactions in a criminal, civil or administrative hearing, lawsuit, investigation, audit or report, or from the news media.  To the extent that there has been any public disclosure unknown to Relator, she is an original source under 31 U.S.C. § 3730(e)(4).

10.    Defendant Carondelet Health Network ("Carondelet") is an Arizona non-profit corporation incorporated on or about November 26, 1956, with its principal place of business located at 2202 N. Forbes Road, Tucson, Arizona 85745. At all times relevant hereto, Carondelet was trading as and/or doing business as both Carondelet St. Mary's Hospital ("CSM"), which is located at 1601 W. St. Mary's Road, Tucson, Arizona 85745, and Carondelet St. Joseph's Hospital ("CSJ"), which is located at 350 N. Wilmot Road, Tucson, Arizona 85711.  Carondelet Health Network, Carondelet Health Network t/a and/or d/b/a Carondelet St. Mary's Hospital, and

Carondelet St. Joseph's Hospital shall be collectively referred to herein as "Defendants."

11.    At all times relevant hereto, Carondelet has been a "Provider of services," providing Inpatient Rehabilitation Facility services under the Medicare program, as defined below.

## IV.    LEGAL BACKGROUND

### A. Medicare

12.    Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.  At all times relevant hereto, the United States has administered Medicare through the Department of Health and Human Services ("HHS"), and its component agency, the Centers for Medicare and Medicaid Services ("CMS").  Acting through intermediary contractors, CMS has reviewed and approved claims submitted for medical reimbursement by providers of items and services to Medicare beneficiaries, and made payments to providers using monies allocated by the United States, on those claims which appear to qualify for reimbursement under the Medicare program.

13.    Medicare Part A provides payment for IRF services.  *See* 42 C.F.R. § 412.622; *see also* Medicare Benefit Policy Manual, Pub. 100-02, Ch. 1 § 110 (2010) (hereinafter "MBPM").

14.    At all times relevant hereto, the Defendants provided "inpatient hospital services", as defined in Title 42 of the Code of Federal Regulations.  *See* 42 U.S.C. § 1395x(b).

### B.    Background of the Medicare IRF Coverage Rules

15.    The Medicare rules governing IRF coverage have been in effect since 1985.  These rules were initially issued in Health Care Financing Administration ("HCFA") Ruling 85-2 and were subsequently incorporated into the Medicare

4

Benefit Policy Manual ("MBPM") at Chapter 1, Section 110.  Ruling 85-2 provided that two basic requirements must be met for inpatient hospital rehabilitation care to be covered by Medicare:

> 1.  The services must be reasonable and necessary (in terms of efficacy, duration, frequency, and amount) for the treatment of the patient's condition; and
>
> 2.  It must be reasonable and necessary to furnish the care on an inpatient hospital basis, rather than in a less intensive facility, such as a SNF, or on an outpatient basis.

MBMP Ch. 1, § 110 (2003).

16.    The Ruling and the manual provisions also established eight "screening criteria," which, if met, established the above two requirements for coverage:

> 1. Close medical supervision by a physician with specialized training or experience in rehabilitation;
>
> 2.  Twenty-four hour rehabilitation nursing;
>
> 3.  Relatively intense level of rehabilitation services;
>
> 4.  Multi-disciplinary team approach to delivery of program;
>
> 5.  Coordinated program of care;
>
> 6.  Significant practical improvement;
>
> 7.  Realistic goals; and
>
> 8.  Reasonable length of rehabilitation program.

*See* MBMP Ch. 1, §§ 110.4 – 110.5 (2003).

17.    The third screening criterion, relatively intense level of rehabilitation services, encompassed what was commonly referred to as the "three hour rule." HFCA 85-2 provided that "the patient must require and receive at least three hours a day of physical and/or occupational therapy. (The furnishing of services no less than

1  five days a week satisfies the requirement for daily services.)" MBMP Ch. 1, § 110.4

2  (2003).

3     18.    The MBMP further provided:

4     While most patients requiring an inpatient stay for rehabilitation need
       and receive at least three hours a day of physical and/or occupational
5     therapy, there can be exceptions because individual patient's needs
       vary. In some instances, patients who require inpatient hospital
6     rehabilitation services may need, on a priority basis, other skilled
       rehabilitative modalities such as speech-language pathology services, or
7     prosthetic-orthotic services and their stage of recovery makes the
       concurrent receipt of intensive physical therapy or occupational therapy
8     services inappropriate. In such cases, the 3-hour a day requirement can
       be met by a combination of these other therapeutic services instead of or
9     in addition to physical therapy and/or occupational therapy.

10    An inpatient stay for rehabilitation care can also be covered even
       though the patient has a secondary diagnosis or medical complication
11    that prevents participation in a program consisting of three hours of
       therapy a day. Inpatient hospital care in these cases may be the only
12    reasonable means by which even a low intensity rehabilitation program
       may be carried out. The intermediary secures documentation of the
13    existence and extent of complicating conditions affecting the carrying
       out of a rehabilitation program to ensure that inpatient hospital care for
14    less than intensive rehabilitation care is actually needed.

15  MBMP Ch. 1, § 110.4.3 (2003).

16     C.    **Current IRF Coverage Rules**

17     19.    In 2009, CMS rescinded HFCA 85-2 and revised the IRF prospective

18  payment system and MBMP. *See* 42 C.F.R. § 412.622 (74 Fed. Reg. 39762 (August 7,

19  2009)); *see also* CMS Transmittal 112 (October 23, 2009) (revising, in relevant part,

20  sections 110, 110.1, 110.2, and 110.2.1 of the MBMP, the sections that cover IRF

21  services, documentation requirements, medical necessity criteria, and multiple

22  therapy disciplines); *see also* CMS Transmittal 119 (January 15, 2010) (deleting, in

23  relevant part, sections 110.3.1 through 110.5 of the MBMP, the sections that describe

24  coverage for inpatient rehabilitation services provided in IRFs).   These changes

25  became effective for all IRF discharges occurring on or after January 1, 2010. CMS

26  Transmittal 112.

6

20.    Under the current prospective payment system, IRFs receive a predetermined amount per discharge for inpatient services furnished to Medicare Part A fee-for-service beneficiaries.    42 C.F.R. § 410.622(a)(1).    The amount of payment under the prospective payment system is based on the federal payment rate, including adjustments described in 42 C.F.R. § 412.624 and, if applicable, during a transition period, on a blend of the federal payment rate and the facility-specific payment rate described in 42 C.F.R. § 412.626. *Id.* § 410.622(a)(2).

21.    Medicare does not pay for any and all services furnished to Medicare beneficiaries but only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

22.    The revised IRF coverage rules further provide:

IRF care is only considered by Medicare to be reasonable and necessary under 1862(a)(1)(A) of the Social Security Act if the patient meets all of the requirements outlined in 42 CFR §§ 412.622(a)(3), (4), and (5), as interpreted in this section. This is true regardless of whether the patient is treated in the IRF for 1 or more of the 13 medical conditions listed in 42 CFR § 412.23(b)(2)(ii) or not. Medicare requires determinations of whether IRF stays are reasonable and necessary to be based on an assessment of each beneficiary's individual care needs.

CMS Transmittal 119.

### 1. IRF Coverage Criteria

23.    In order for an IRF claim to be considered reasonable and necessary there must be a reasonable expectation that the patient meets all of the following requirements at the time of the patient's admission to the IRF:

(i) Requires the active and ongoing therapeutic intervention of multiple therapy disciplines (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy), one of which must be physical or occupational therapy.

(ii) Generally requires and can reasonably be expected to actively participate in, and benefit from, an intensive rehabilitation therapy program. Under current industry standards, this intensive rehabilitation therapy program generally consists of at least 3 hours of therapy (physical therapy, occupational therapy, speech-language pathology, or

prosthetics/orthotics therapy) per day at least 5 days per week. In certain well-documented cases, this intensive rehabilitation therapy program might instead consist of at least 15 hours of intensive rehabilitation therapy within a 7 consecutive day period, beginning with the date of admission to the IRF. Benefit from this intensive rehabilitation therapy program is demonstrated by measurable improvement that will be of practical value to the patient in improving the patient's functional capacity or adaptation to impairments. The required therapy treatments must begin within 36 hours from midnight of the day of admission to the IRF.

(iii) Is sufficiently stable at the time of admission to the IRF to be able to actively participate in the intensive rehabilitation therapy program that is described in paragraph (a)(3)(ii) of this section.

(iv) Requires physician supervision by a rehabilitation physician, defined as a licensed physician with specialized training and experience in inpatient rehabilitation. The requirement for medical supervision means that the rehabilitation physician must conduct face-to-face visits with the patient at least 3 days per week throughout the patient's stay in the IRF to assess the patient both medically and functionally, as well as to modify the course of treatment as needed to maximize the patient's capacity to benefit from the rehabilitation process.

42 C.F.R. § 412.622(a)(3)(2002).

## 2. Documentation

24.    To document that each patient for whom the IRF seeks payment is reasonably expected to meet all of the requirements in paragraph (a)(3) of Section 412.622 at the time of admission, the patient's medical record at the IRF must contain the following documentation:

(i) A comprehensive preadmission screening that meets all of the following requirements—

(A) It is conducted by a licensed or certified clinician(s) designated by a rehabilitation physician described in paragraph (a)(3)(iv) of this section within the 48 hours immediately preceding the IRF admission. A preadmission screening that includes all of the required elements, but that is conducted more than 48 hours immediately preceding the IRF admission, will be accepted as long as an update is conducted in person or by telephone to update the patient's medical and functional status within the 48 hours immediately preceding the IRF admission and is documented in the patient's medical record.

(B) It includes a detailed and comprehensive review of each patient's condition and medical history.

(C) It serves as the basis for the initial determination of whether or not the patient meets the requirements for an IRF admission to be considered reasonable and necessary in paragraph (a)(3) of this section.

(D) It is used to inform a rehabilitation physician who reviews and documents his or her concurrence with the findings and results of the preadmission screening.

(E) It is retained in the patient's medical record at the IRF.

(ii) A post-admission physician evaluation that meets all of the following requirements—

(A) It is completed by a rehabilitation physician within 24 hours of the patient's admission to the IRF.

(B) It documents the patient's status on admission to the IRF, includes a comparison with the information noted in the preadmission screening documentation, and serves as the basis for the development of the overall individualized plan of care.

(C) It is retained in the patient's medical record at the IRF.

(iii) An individualized overall plan of care for the patient that meets all of the following requirements—

(A) It is developed by a rehabilitation physician, as defined in paragraph (a)(3)(iv) of this section, with input from the interdisciplinary team within 4 days of the patient's admission to the IRF.

(B) It is retained in the patient's medical record at the IRF.

42 C.F.R. § 412.622(a)(4).

## 3. Interdisciplinary Team Approach to Care

25.    In addition, in order for an IRF claim to be considered reasonable and necessary under Medicare, the patient must require an interdisciplinary team approach to care, as evidenced by documentation in the patient's medical record of weekly interdisciplinary team meetings that meet all of the following requirements:

(A) The team meetings are led by a rehabilitation physician as defined in paragraph (a)(3)(iv) of this section, and further consist of a registered

9

nurse with specialized training or experience in rehabilitation; a social worker or case manager (or both); and a licensed or certified therapist from each therapy discipline involved in treating the patient. All team members must have current knowledge of the patient's medical and functional status.

(B) The team meetings occur at least once per week throughout the duration of the patient's stay to implement appropriate treatment services; review the patient's progress toward stated rehabilitation goals; identify any problems that could impede progress towards those goals; and, where necessary, reassess previously established goals in light of impediments, revise the treatment plan in light of new goals, and monitor continued progress toward those goals.

(C) The results and findings of the team meetings, and the concurrence by the rehabilitation physician with those results and findings, are retained in the patient's medical record.

42 C.F.R. § 412.622(a)(5).

### 4. Intensive Level of Rehabilitation Services

26.    The current MBMP provides as follows:

A primary distinction between the IRF environment and other rehabilitation settings is the intensity of rehabilitation therapy services provided in an IRF. For this reason, the information in the patient's IRF medical record (especially the required documentation described in section 110.1) must document a reasonable expectation that at the time of admission to the IRF the patient generally required the intensive rehabilitation therapy services that are uniquely provided in IRFs. Although the intensity of rehabilitation services can be reflected in various ways, the generally-accepted standard by which the intensity of these services is typically demonstrated in IRFs is by the provision of intensive therapies at least 3 hours per day at least 5 days per week. However, this is not the only way that such intensity of services can be demonstrated (that is, CMS does not intend for this measure to be used as a "rule of thumb" for determining whether a particular IRF claim is reasonable and necessary).

The intensity of therapy services provided in IRFs could also be demonstrated by the provision of 15 hours of therapy per week (that is, in a 7-consecutive day period starting from the date of admission). For example, if a hypothetical IRF patient was admitted to an IRF for a hip fracture, but was also undergoing chemotherapy for an unrelated issue, the patient might not be able to tolerate therapy on a predictable basis due to the chemotherapy. Thus, this hypothetical patient might be more effectively served by the provision of 4 hours of therapy 3 days per week and 1 ½ hours of therapy on 2 (or more) other days per week in order to accommodate his or her chemotherapy schedule. Thus, IRFs may also demonstrate a patient's need for intensive rehabilitation therapy services by showing that the patient required and could reasonably be expected to benefit from at least 15 hours of therapy per

week (defined as a 7-consecutve day period starting from the date of admission), as long as the reasons for the patient's need for this program of intensive rehabilitation are well-documented in the patient's IRF medical record and the overall amount of therapy can reasonably be expected to benefit the patient. Many IRF patients will medically benefit from more than 3 hours of therapy per day or more than 15 hours of therapy per week, when all types of therapy are considered. However, the intensity of therapy provided must be reasonable and necessary under section 1862(a)(1)(A) of the Act and must never exceed the patient's level of need or tolerance, or compromise the patient's safety. See below for a brief exceptions policy for temporary and unexpected events.

MBPM Ch. 1, § 110.2.2 (2010).

## 5. Further Clarification Provided by CMS

27.     Further, in an undated document titled "Follow-up information from the November 12 provider training call" ("Provider Training Call Follow-up"), CMS provided a series of clarifications regarding its policies regarding IRF services. The document reiterates that for IRF care to be reasonable and necessary, "the patient must require treatment from multiple therapy disciplines, and the patient must reasonably be expected to require, participate in, and benefit significantly from the intensive rehabilitation therapy program provided in the IRF on admission." *See* Provider Training Call Follow-up.

### a. Clarification regarding CMS 's Brief Exceptions Policy

28.     CMS provided "clarification regarding the brief exceptions policy" as follows:

The new IRF coverage requirements permit Medicare's contractors to grant brief exceptions (not to exceed 3 consecutive calendar days) to the intensity of therapy requirements for unexpected clinical events that limit a patient's ability to participate in therapy for a limited number of days. For example, if a patient's plan of care for a particular week calls for the patient to receive a specified number of hours of therapy on Monday, Tuesday, Wednesday, Thursday, and Friday of that week, but the patient experiences an unexpected clinical event on Sunday night that limits the patient's ability to participate in therapy on Monday and Tuesday, Medicare's contractors are authorized to allow a brief break in the provision of therapy services on Monday and Tuesday of that week, as long as the reasons for the break in therapy are well-documented in

the patient's medical record at the IRF.  Since the provision of therapies on Saturday and Sunday were not part of this particular patient's plan of care for that week, this example would illustrate a 2 day break in the provision of the patient's intensive rehabilitation therapy program.

Under no circumstances may the IRF adjust a patient's therapy plan to facilitate scheduling of the IRF staff or for the convenience of the staff. Also, the brief exceptions policy does not apply to the first 3 days of the patient's admission to the IRF.

Provider Training Call Follow-up;  see MBPM Ch.1, § 110.2.2 (2010).

> **b. Clarification as to demonstrating the intensity of therapy requirement for patients who are discharged within 7 days after admission to the IRF (or are in the IRF longer than 7 days but are discharged mid-term in their plan of care)**

29.    CMS further provided that "IRFs must document in patients' medical records at the IRF that patients are receiving the appropriate intensive rehabilitation therapy program in the IRF up until the day of discharge."  *See* Provider Training Call Follow-up.

## V. FACTUAL BACKGROUND

30.    As summarized above and set forth in detail below, Defendants cause the submission of false claims by engaging in the fraudulent submission of claims for IRF services provided to Medicare beneficiaries.  The section begins with the 2010 Audit of Carondelet's IRF facilities, the year in which the current IRF regulations became effective, and proceeds to the 2011 Audit, conducted by Bloink.

### B.    2010 Audit

31.    As a member of the Ascension Health system, Carondelet conducts annual audits of its facilities using the "Corporate Responsibility Program Effectiveness Assessment" protocol ("hereinafter Effectiveness Assessment") designed by the Ascension Health Corporate Responsibility Department.

32.    The Effectiveness Assessment is to the Ascension Health Corporate

Responsibility Department in January of the year following the audit. Individual audit results are not provided to the Ascension Health Corporate Responsibility Department.

33.    The annual audit, mandated by the Ascension Health Corporate Responsibility Department, is conducted:

> to determine the presence, completeness and timeliness of required physician pre-admission screenings; valid physician orders; physician post-evaluation examinations; therapy evaluations and treatment; plan of care; interdisciplinary team conference; completion and delivery of the patient assessment instrument ("PAI"); accuracy of codes assigned (diagnostic, discharge disposition, admission source, revenue); and interrupted stay determination.

34.    On February 19, 2010 and "in accordance with Ascension Health Corporate Responsibility annual auditing/monitoring requirements," Corporate Responsibility Coordinator Rachel Harnish completed the Inpatient Rehabilitation Facility ("IRF") Audit for 2010 ("2010 Audit"). The 2010 Audit consisted of two reviews of patients receiving IRF services at: (1) Carondelet St. Mary's Hospital ("CSM"); (2) Carondelet St. Joseph's Hospital ("CSJ").

### 1. 2010 CSM Audit

35.    On or about February 10, 2010, Harnish completed her 2010 CSM Audit. For the 2010 CSM Audit, Harnish reviewed the charts of fifteen patients who had received IRF services at CSM. All fifteen cases were Medicare beneficiaries. All fifteen Medicare beneficiaries had been discharged in January 2010. Harnish's 2010 CSM Audit revealed that nine out of fifteen patient charts lacked preadmission screening documentation to support services as required by Medicare (60% error rate) and that eleven of fifteen patient charts showed that the Medicare beneficiaries did not receive fifteen hours of therapy in a seven-consecutive day period (73% error rate).

### a.    Pre-admit screening documentation

36.    In her "Comments" section of the 2010 CSM Audit for "Pre-admit screening documentation," Harnish stated:

> According to Medicare IOM 100-02, Ch.1, Section 110.1.1, "A preadmission screening...must be conducted by licensed or certified clinician(s) within the 48 hours immediately preceding the IRF admission." And "...the rehabilitation physician must document that he/she has reviewed and concurs with the findings and results of the preadmission screening prior to the IRF admission."
>
> 9 of the 15 charts reviewed did not have preadmission screening documentation to support services as required by Medicare.

37.    Harnish's audit thus revealed a 60% error rate for Pre-admit screening documentation.

### b.    Therapy frequency

38.    In her "Comments" section of the 2010 CSM Audit for therapy frequency, Harnish stated:

> According to Medicare IOM 100-02, Ch.1, Section 110.2.2, "...the generally-accepted standard by which the intensity of these services is typically demonstrated in IRFs by the provision of intensive therapies at least 3 hours per day at least 5 days per week" and the "intensity of therapy services provided in IRFs could also be demonstrated by the provision of 15 hours of therapy per week (that is, in a 7-consecutive day period starting from the date of admission.
>
> 15 hours of therapy in a 7-consecutive day period was the threshold used in this audit.
>
> Therapist notes were reviewed to determine reasons as to why therapy did not equal 15 hours in a 7-consecutive day period. 90% of the reasons noted in documentation were due to "increased demand for therapy services by the hospital". To see the breakdown of the reasons (including the patient being too ill or off the floor for tests; please see the Comments section of the spreadsheet (2J-K notes in Comments section).
>
> Medicare does allow brief exceptions to the intensity of therapy (see the Brief Exceptions Policy in Section 110.2.2). However, the majority of the cases lacking_intensity were not due to the patient's inability to participate in the intensive therapy program...they were due to apparent and documented staffing issues.

Please note that the majority of therapy did not begin until the day after admission. This is acceptable by Medicare; however, it may be a contributing factor to not achieving the required intensity of therapy.

## 2. 2010 CSJ Audit

39.     On or about February 19, 2010, Harnish completed her 2010 CSJ Audit. For the 2010 CSJ Audit, Harnish reviewed the charts of fifteen patients who had received IRF services at CSJ. All fifteen cases were Medicare beneficiaries. All fifteen Medicare beneficiaries had been discharged in or about January 2010. Harnish's 2010 CSJ Audit revealed that thirteen of fourteen applicable patient charts lacked plan of care documentation to support services as required by Medicare (93% error rate); that ten of thirteen applicable patient charts did not have team conference meeting documentation to support services as required by Medicare (77% error rate); and that twelve of fourteen applicable patient charts showed that the Medicare beneficiaries did not receive fifteen hours of therapy in a seven-consecutive day period (86% error rate).

### a.     Plan of care documentation

40.     In her "Comments" section of the 2010 CSJ Audit for plan of care documentation, Harnish stated:

According to Medicare IOM 100-02 Ch. 1, Section 110.1.3, "In order for the IRF admission to be considered reasonable and necessary, the overall plan of care must be completed within the first 4 days of the IRF admission..." and "...it is the sole responsibility of a rehabilitation physician to integrate the information that is required in the overall plan of care and to document it in the patient's medical record at the IRF."

13 of the 14 charts (1 of the 15 charts had a [Length of Stay ("LOS")] <4 days...considered N/A) reviewed did not have plan of care documentation (approved/signed by rehab physician) to support services as required by Medicare.

41.     Harnish's audit thus revealed a 93% error rate for plan of care documentation.

### b.   Team conference meeting documentation

42.   In her "Comments" section of the 2010 CSJ Audit for "Team conference meeting form signed by all involved in patient's care," Harnish stated:

> According to Medicare IOM 100-02, Ch. 1, Section 110.2.5, "It is expected that **all** treating professionals from the required disciplines will be at **every** meeting…"

> 10 of the 13 charts (13 patients had LOS of ≥7 days requiring TC meeting from [*sic*]) reviewed did not have documentation to support all treating professionals attending/participating team conference meetings as required by Medicare.

> Of note, the **signature page** of the TC meeting form requires a date in the date/time section on that page.  If the only date is the date on the 1st page of the form, then it is impossible to determine what signature page belongs to what dated 1st page when there are multiple TC meeting forms on the chart.

43.   Harnish's audit thus revealed a 77% error rate for team conference meeting documentation.

### c.   Therapy frequency

44.   In her "Comments" section of the 2010 CSJ Audit for therapy frequency, Harnish stated:

> According to Medicare IOM 100-02, Ch.1, Section 110.2.2, "…the generally-accepted standard by which the intensity of these services is typically demonstrated in IRFs by the provision of intensive therapies at least 3 hours per day at least 5 days per week" and "the intensity of therapy services provided in IRFs could also be demonstrated by the provision of 15 hours of therapy per week (that is, in a 7-consecutive day period starting from the date of admission."

> 15 hours of therapy in a 7-consecutive day period was the threshold used in this audit.

> Note:  One patient had a LOS of only 2 days before being transferred to ICU—not enough LOS to calculate this issue; therefore, the calculation was based on 14 charts only.

> Therapist notes were reviewed to determine reasons as to why therapy did not equal 15 hours in a 7-consecutive day period.

> Shortened treatment sessions should be the exception to the rule…not the rule.  With those rare cases where the patient does not receive

1    therapy or the session is shortened, clear precise chart documentation of
     the condition/reasoning leading to the shortened therapy time should
2    be the standard.    An example of good documentation would be
     "Treatment session shortened 15 minutes due to patient going to RAD
3    for CXR."

4    A few of the therapists indicated clearly in their documentation the
     reason why the patient did not receive the full treatment time of
5    services. Kudos to them!

6    To see the breakdown of the reasons (including the patient being too ill
     or off the floor for tests); please see the Comments section of the
7    spreadsheet (2J-K notes in Comments section).

8    Medicare does allow brief exceptions to the intensity of therapy (see the
     Brief Exceptions Policy in Section 110.2.2). However, the majority of the
9    cases lacking intensity were not due to the patient's inability to
     participate in the intensive therapy program...they were due to
10   apparent and documented staffing issues.

11   Please note that the majority of therapy did not begin until the day after
     admission.    This is acceptable by Medicare; however, it may be a
12   contributing factor to not achieving the required intensity of therapy.

13   45.    Harnish's audit thus revealed an 86% error rate for therapy frequency.

14   ## 3. Submission of 2010 Audits to Carondelet Management

15   ### a.    2010 CSM Audit Submission

16   46.    On February 10, 2010, Harnish sent an email with the subject line

17   "FINAL REPORT--CSM 2010 Annual IP Rehab Audit" to Corporate Responsibility

18   Officer ("CRO") Mary Hill, CSM Rehabilitation Department Manager David E.

19   Anderson, CEO CSM Winnie S. Fritz, CSM Medical Director Amy E. Beiter, and

20   CSM Director of Rehabilitation Diana McBroom.  The email stated in relevant part:

21   Attached is the **final** version of the CSM 2010 Annual IP Rehab Audit
     recently conducted by Corporate Responsibility.  A draft had been sent
22   to you last week for your review and/or comments prior to this final
     version being submitted.    Please review the attached documents
23   thoroughly.

24   Please note that the due date for your attached **Corrective Action Plan
     (CAP)** is **Thursday, 1/25/10** [sic].  The following department(s) is/are
25   responsible for Corrective Action Plan (CAP) submission.
     1. IP Rehab

26

If you have any questions, please feel free to contact me. Also, please make every effort to have your Corrective Action Plan (CAP) completed and returned to Corporate Responsibility prior to the due date noted above.

47.    The email contained the CSM 2010 Annual IP Rehab Audit, a spreadsheet providing details of the 2010 CSM Audit, and a request for a corrective action plan.

### b.    2010 CSM Corrective Action Plan

48.    The CSM Corrective Action Plan was completed on or about February 25, 2010. For each issue identified by Harnish, CSM had to either develop or re-design its processes to ensure CSM was Medicare compliant.

49.    In the section "Departmental Corrective Action Taken or To Be Taken" regarding pre-admit screening documentation, CSM provided:

**1) Details of corrective action:** (*what* action will be taken, *who* will be responsible for the action, *how* will the action be put into place)

- o  Education done to the 3 IP Rehab ward clerks to place Preadmission Screening form or copy of the Physiatrists' consult (which serves as the Preadmission Screening) into the Rehab chart while assembling charts for new admissions.
- o  Ward clerks will label either the Preadmission Screening form or the Physiatrists' consult with the patients' Rehab label, and place in the Rehab chart in the back of the progress notes.
- o  The PPS Coordinator will double check to make sure the Preadmission Screening form/consult are in the charts when doing the documentation of the Patient Rehab Rights form on the education form within the first 4 days on IP Rehab.
- o  Feedback to the Clinical [sic] Liaison and Physiatrists during our meeting on February 16th.

**2) Date of implementation and/or completion:** 02/16/10
- o  Education of clerks was done on 02-08-10, 02-09-10, and 2-12-10
- o  PPS Coordinator began checks for Preadmission Screening forms/consults on 02-15-10.

50.    In the section "Departmental Corrective Action Taken or To Be Taken" regarding therapy frequency, CSM provided:

**1) Details of corrective action:** (*what* action will be taken, *who* will be responsible for the action, *how* will the action be put into place)

18

- Sharing of information/awareness with Rehab Coor. by the Rehab Services Mngr on Feb. 5th.
- Rehab Services Mngr shared information with the CHN Leadership mtg on Feb. 9th.
- Rehab Serv. Mngr. shared information with CSM Leadership during mtg on Feb 16th.
- Rehab Serv. Mngr shared information with therapy staff on Feb 10th, 15th, and 24th during department meetings.
- Rehab Serv. Mngr and Rehab Nsng Mngr. will work w/ case mngmt. and other internal PCS units to facilitate earlier admissions (before 1pm) so as to be able to initiate therapy services on day 1. Target is > 50%.
- Utilize Rehab Techs consistently to facilitate efficient provision of therapy services by licensed/certified personnel.
- Rehab Serv. Mngr will work with IS for re-vamping of monthly rehab report to more accurately reflect actual therapy time.
- Rehab Coor. will do ongoing audits to determine progress/compliance (5/month).
- Rehab Coor. and lead therapists to adjust/shift staffing resources to maximize availability and effectively provide services.
- Rehab Mngr will work closely with HR staff for focus on PT/OT hiring of new staff and retention of current staff. (mtg dates Jan 7th, Jan 28th, and Feb 22nd.)

**2) Date of implementation and/or completion:** 02/22/10

### c. 2010 CSJ Audit Submission

51.    On February 19, 2010, Harnish sent an email nearly identical to her February 10, 2010 email with the subject line "FINAL--CSJ 2010 Annual IP Rehab Audit" to Corporate Responsibility Officer ("CRO") Mary Hill, CSJ CEO Odette Bolano, CSJ Chief Nursing Officer ("CNO") Debra Finch, and CSJ IRF managers Jean Glattke and Dina Perez-Graham.  The email stated in relevant part:

> Attached is the **final** version of the CSJ 2010 Annual IP Rehab Audit recently conducted by Corporate Responsibility.  A draft had been sent to you last week for your review and/or comments prior to this final version being submitted.  Please review the attached documents thoroughly.
>
> Please note that the due date for your attached **Corrective Action Plan (CAP)** is **Friday, 3/5/10.**  The following department(s) is/are responsible for Corrective Action Plan (CAP) submission.
>     **1. IP Rehab**

If you have any questions, please feel free to contact me. Also, please make every effort to have your Corrective Action Plan (CAP) completed and returned to Corporate Responsibility prior to the due date noted above.

52.    The email contained the CSJ 2010 Annual IP Rehab Audit, a spreadsheet providing details of the 2010 CSJ Audit, and a corrective action plan request.

### d. 2010 CSJ Corrective Action Plan

53.    The CSJ Corrective Action Plan was completed on or about March 5, 2010. Like CSM, CSJ had to either develop or re-design its processes to ensure it was Medicare compliant.

54.    In the section "Departmental Corrective Action Taken or To Be Taken" regarding pre- plan of care documentation, CSJ provided:

**1) Details of corrective action:** (*what* action will be taken, *who* will be responsible for the action, *how* will the action be put into place)

o   Review process and content with Dr. Wang. Cheryl Wolaver
o   Develop template for POC summary.  C. Wolver/S.Kiefer

**2) Date of implementation and/or completion:** 02/22/10

55.    In the section "Departmental Corrective Action Taken or To Be Taken" regarding "Team conference meeting form signed by all involved in patient's care," CSJ provided:

**1) Details of corrective action:** (*what* action will be taken, *who* will be responsible for the action, *how* will the action be put into place)

o   TC facilitator will insure all attendees sign before leaving room, inc. Dr. Wang; C. Wolover
o   Audits will review TC form for completeness and signatures. Will obtain any missing signatures. J. Bracken
o   Will include 100% audit of TC form as part of audit already in place. J. Bracken

**2) Date of implementation and/or completion:** 02/16/10

56.    In the section "Departmental Corrective Action regarding therapy

frequency, CSJ provided:

> **1) Details of corrective action:**  (*what* action will be taken, *who* will be responsible for the action, *how* will the action be put into place)
>
> o  Will initiate 100% concurrent review of charts, using the actual time entered by therapists for calculation.  Dennis Kyler
> o  Develop a tabulation grid for charts that indicates RX hours received over first seven days.  S. Kiefer/K. Spradling by 3/8/10

**2) Date of implementation and/or completion:**  02/2/10 and 3/8/10

### e.  Carondelet fails to reimburse Medicare

57.    Despite the results of Harnish's 2010 CSM and CSJ Audits, Carondelet failed to reimburse monies owed to Medicare for patient charts that lacked documentation to support services as required by Medicare.

### B.    2011 Audit

58.    In February 2011 and as mandated by the Ascension Health Corporate Responsibility Department, Bloink initiated the Inpatient Rehabilitation Facility ("IRF") Audit for 2011 ("2011 Audit").  Like the 2010 Audit, the 2011 Audit consisted of reviews of patients receiving IRF services at CSM and CSJ.  On March 19, 2011 at CSM, Bloink met with Judith Beal, CSM Inpatient Rehab Services Manager, and Donna Patterson, CSM Prospective Payment System ("PPS") Manager in the Rehabilitation Department, to discuss Bloink's review of CSM IRF patient information for the 2011 Audit.  Similarly, on March 22, 2011 at CSJ, Bloink met with Therese ("Teri") Flanagan, CSJ Director of Rehabilitation, and Kary Spradling, CSJ Rehabilitation Inpatient Therapy Manager, to discuss Bloink's review of CSJ IRF patient information for the 2011 Audit.

### 1.  2011 CSM Audit

59.    In April 2011, Bloink completed her 2011 CSM Audit.  For the 2011 CSM Audit, Bloink reviewed the charts of fifteen patients who had received IRF services at CSM.  All fifteen cases were Medicare beneficiaries.  All fifteen Medicare

beneficiaries received service between November 2010 and January 2011. Bloink's

2011 CSM Audit revealed that seven out of fifteen patient charts failed to meet the

rehabilitation therapy time requirements as required by Medicare (47% error rate).

60.    In her "Finding" section of the 2011 CSM Audit regarding rehabilitation

therapy, Bloink wrote:

> **Rehab therapy** did not meet time requirements. **Case 4** ($20,524.75), **5**
> ($91,682.90), **7** ($30,665.75), **9** ($15,140.25), ***12 (already entered on line
> 1)**, **14** ($9,526.00), **15** ($29,930.00). **Case 12** was already calculated for
> lack of pre-admit screen.

61.    Bloink audited the patient charts as documented in the 2011 CSM

Effectiveness Assessment forms. Bloink further calculated the total "Reimbursement

Impact," reflecting the amount CSM owed Medicare for failure to meet Medicare's

guidelines, to be $197,469.65.

### 2. 2011 CSJ Audit

62.    On May 6, 2011, Bloink completed her 2011 CSJ Audit. For the 2011 CSJ

Audit, Bloink reviewed the charts of fifteen patients who had received IRF services

at CSJ. All fifteen cases were Medicare beneficiaries. All fifteen Medicare

beneficiaries received service between November 2010 and January 2011. Bloink's

2011 CSJ Audit revealed that all fifteen patient charts failed to meet the

rehabilitation therapy time requirements as required by Medicare (100% error rate).

63.    In her "Finding" section of the 2011 CSJ Audit regarding rehabilitation

therapy, Bloink wrote:

> Rehab <u>therapy did not meet time requirements</u>. Case 2, PT and OT
> Eval. <u>was not billed</u>. Case 6, No therapy units billed, but 145 units
> counted. <u>15 cases did not have the needed therapy unit time as
> required by Medicare.</u> Case 1. 87% time met (total $15,781.75); 2. 58%
> time met (total $39,046.70); 3. 40% time met (total $14,671.25); 4. 71%
> time met (total $53,821.50); 5. 57% time met (total $97,212.60); 6. 75%
> time met (total $79,654.25); 7. 82% time met (total $44,531.00); 8. 60%
> time met (total $46,239.50); 9. 62% time met (total $48,098.90); 10. 83%
> time met (total $20,570.25); 11. 71% time met (total $22,748.50); 12. 63%
> time met (total $39,780.25); 13. 85% time met (total $19,653.00); 14 58%

time met (total $21,092.75); **15. 83%** time met (total $57,960.25). **Average % of therapy provided per case was 69% of what was required.**

64.    Bloink audited the patient charts as documented in the 2011 CSJ Effectiveness Assessment forms. Bloink further calculated CSJ's total "Reimbursement Impact" to be $620,862.45.

### 3. Submission of 2011 Audits to Carondelet Management

65.    Bloink prepared a "2011 Annual Rehabilitation Coding/Billing Audit Report" to be submitted at the June 2011 Audit Committee Meeting. The report found that, for rehabilitation therapy time requirements, the 2010 and 2011 Audits each had error rates of 77%. The report went on to state, in relevant part:

> To address the errors identified during the 2011 Inpatient Rehabilitation Facility Coding/Billing Audit, management is taking the following actions to correct coding errors:
>
> 1. Rebilling claims as appropriate.
> 2. Follow up and education for Appropriate CHN physicians and associates.
> 3. Ongoing auditing and monitoring by Clinical Leadership, HIM Department, Admission and Corporate Responsibility Department.

### a.    2011 CSJ Audit

66.    On April 18, 2011 at 2:00 p.m., Bloink met with Flanagan and Spradling at CSJ to discuss the preliminary findings of the 2011 CSJ Audit.

67.    On the morning of May 6, 2011, Bloink received a call from Andrew Conkovich, Corporate Responsibility Officer, from Bolano's office at CSJ. In the office with Conkovich were Bolano and CSJ Chief Operating Officer Debra Finch. Conkovich, Bolano, and Finch wished to discuss the negative results of Bloink's 2011 CSJ Audit. During the call, Conkovich brought up the 2010 CSJ Audit. Bolano and Finch denied having received the 2010 CSJ Audit; Bolano further stated she would talk to Spradling and Flanagan about the results from the 2010 CSJ Audit. At 11:35 a.m., Bloink sent an email to Conkovich, Spradling, Flanagan, and Bolano. Bloink

1    attached a copy of Hamisch's 2010 CSJ Audit to the email.

2        68.    On May 10, 2011 at 9:10 a.m., Bloink sent an email to Finch and

3    Conkovich containing a summary of the 2011 CSJ Audit; "Medicare Rules revised

4    Jan 2010;" and a sample Patient Assessment Instrument.  On May 20, 2011 at 3:35

5    p.m., Bloink emailed Spradling, Flanagan, CSJ PPS Manager Sandra Kiefer, Finch,

6    Bolano, and Conkovich a final version of the 2011 CSJ Audit.

7        69.    Despite the results of Bloink's 2011 CSJ Audit, Carondelet failed to

8    reimburse monies owed to Medicare for patient charts that lacked documentation to

9    support services as required by Medicare.

10                        **b.    2011 CSM Audit**

11        70.    On April 19, 2011 at 2:00 p.m., Bloink met with Beal and Patterson at

12    CSM to discuss the preliminary findings of the 2011 CSM Audit.

13        71.    On April 29, 2011 at 1:11 p.m., Bloink and Beal received an email from

14    Patterson confirming her understanding of the 2011 CSM Audit findings.  Patterson

15    attached her review of Bloink's findings ("Corporate Compliance Audit, April

16    2011").

17        72.    On May 2, 2011, Bloink emailed Patterson and Beal to confirm the

18    findings of the 2011 CSM Audit.

19        73.    On Friday, May 4, 2011 from approximately 2:00 p.m. until 9:00 p.m.,

20    Bloink met with Patterson at CSM to answer Patterson's questions about the 2011

21    CSM Audit.  Together, Bloink and Patterson verified and memorialized Bloink's

22    findings.  At that time, Patterson acknowledged that CSM had too few therapists to

23    perform services as required by Medicare and that therapists were expensive.

24        74.    On May 10, 2011 at 3:45 p.m., Bloink sent an email to Beal, Patterson,

25    Conkovich, and Fritz containing the 2011 CSM Audit summary, CSM case

26    remittance statements, and the 2011 Corrective Action Plan request.

75.     On May 18, 2011 at 11:06 a.m., Bloink emailed the joint findings to Beal, Patterson, and Conkovich.

76.     On May 20, 2011 at 3:31 p.m., Bloink emailed her findings of the 2011 CSM Audit to Beal and Patterson, copying Fritz, Conkovich, and CSM Chief Nursing Officer Roberta Kaemmerling.

77.     Despite the results of Bloink's 2011 CSM Audit, Carondelet failed to reimburse monies owed to Medicare for patient charts that lacked documentation to support services as required by Medicare.

### C. Other Audits

78.     As set forth in detail below, the Audit Results Report for 2008 ("2008 Audit") and the Initial 2009 Audit Report ("2009 Initial Audit") for both CSM and CSJ reveal that Carondelet submitted claims for reimbursement for IRF services that lacked documentation to support services as required by Medicare.

#### 1. 2008 Audit

79.     On or about February 8, 2008 and pursuant to the CHN Effectiveness Assessment 2007, Section 7D, Harnish completed her 2008 CSM Audit, as well as her 2008 CSJ Audit. For the 2008 CSM and CSJ Audits, Harnish reviewed the charts of fifteen patients who received IRF services at CSM, and the charts of fifteen patients who received IRF services at CSJ. All of the charts reviewed were for Medicare beneficiaries. All of the Medicare beneficiaries were discharged between June 1, 2007 and December 31, 2007.

80.     Harnish's 2008 CSM Audit revealed that, for all fifteen patient charts, team participation was not documented thoroughly (100% error rate); for all fifteen patient charts, inaccurate principal diagnosis codes were assigned (100% error rate); for thirteen out of fifteen patient charts, services audited (*i.e.*, medications, labs,

therapy, psychology visits, PT, OT) were not billed appropriately (87% error rate).

81.    Harnish's 2008 CSJ Audit revealed that, for fourteen out of fifteen patient charts, team participation was not documented thoroughly (93% error rate); for all fifteen patient charts, inaccurate principal diagnosis codes were assigned (100% error rate); and for thirteen out of fifteen patient charts, services audited were not billed appropriately (87% error rate).

82.    Despite the results of Harnish's 2008 CSM and CSJ Audits, Carondelet failed to reimburse monies owed to Medicare—including monies owed for the inappropriately billed services.

### 2. 2009 Initial Audit

83.    On or about February 5, 2009 and pursuant to the Corporate Responsibility Effective Assessment 2008, Section 7-D, Harnish completed initial Audit Reports for CSM and CSJ.  For the 2009 CSM and CSJ Initial Audits, Harnish reviewed the charts of fifteen patients who received IRF services at CSM, and the charts of fifteen patients who received IRF services at CSJ.  All of the charts reviewed were for Medicare beneficiaries.  All of the Medicare beneficiaries were discharged between November 1, 2008 and November 30, 2008.  Further, for CSJ, Harnish reviewed a total of forty-four (44) dates of service ("DOS") "for therapy services billing accuracy (2-3 days of each stay, random selection, PT/OT/SLP services reviewed)".  For CSM, Harnish reviewed a total of sixty-three (63) DOS "for therapy services billing accuracy (2-3 days of each stay, random selection, PT/OT/SLP services reviewed)".

84.    Harnish's 2009 CSM Initial Audit revealed that, for thirteen out of sixty-three patient charts, inaccurate therapy charges were billed (21% error rate).

85.    Harnish's 2009 CSJ Initial Audit revealed that, for six out of forty-four patient charts, inaccurate therapy charges were billed (14% error rate).

86. Despite the results of Harnish's 2009 CSM and CSJ Initial Audits, Carondelet failed to reimburse monies owed to Medicare for the inaccurate therapy charges.

**D. False Claims and the Government's Damages**

87. At all times relevant hereto, Defendants have had numerous patients who are beneficiaries of the Medicare program described above.

88. At all relevant times hereto, Carondelet sought and received payment from Medicare for patients receiving IRF services at CSM and CSJ between 2008 and 2011.

89. Carondelet knowingly and willfully failed to notify Medicare of the results of its audits, and further knowingly and willfully failed to reimburse Medicare for services that did not meet Medicare's requirements.

90. At all times relevant hereto, Carondelet knowingly concealed and continues to conceal its obligation to pay or transmit money to CMS.

91. The charts audited between 2008 and 2011 reflect a systematic and widespread failure to provide services, or documentation to support said services, as required by Medicare.

92. The error rates in the audits at both CSM and CSJ from 2008 to 2011 reflect error rates among the respective patient populations as a whole. 731 Medicare beneficiaries received IRF services between December 22, 2008 and April 1, 2011 from CSJ alone.

93. For each patient chart for which inaccurate therapy charges were billed, the government's damages are the entire amount that the government paid for the hospitalizations or, alternatively and at a minimum, the amount that the government separately allocated as the therapy component of the applicable reimbursement rate.

94.    The United States, through its carriers and intermediaries, has made payments to the Defendants and has been damaged in an amount to be determined. The United States is entitled to treble its actual damages and to civil penalties in the amount of $5,500 to $11,000 for each of the false claims submitted.

## COUNT I

**(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(A))**

95.    Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

96.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States – *i.e.,* the foregoing false and fraudulent claims for payments from Medicare – in violation of 31 U.S.C. § 3729(a)(1)(A).

97.    Said false and fraudulent claims were presented with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

98.    The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid Defendants for these false and fraudulent claims had it known the falsity of the said Medicare claims by Defendants.

99.    As a direct and proximate result of the false and fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

## COUNT II

**(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(B))**

100.    Relator incorporates by reference and re-alleges all paragraphs of this

Complaint set forth above as if fully set forth herein.

101. Defendants knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

102. Defendants' knowingly false records or false statements were material, and on information and belief continue to be material, to the false and fraudulent claims for payments it made to the United States for Medicare reimbursements and benefits.

103. Defendants' materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment that explicitly and/or impliedly attested that they complied with Medicare's preadmission rehabilitation therapy time requirements, screening requirements, plan of care requirements, team conference meeting requirements, and false claims of medical necessity for IRF services.

104. These said false records or false statements were made, used or caused to be made or used, with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

105. As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

COUNT III

(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(G))

106. Relator incorporates by reference and re-alleges all paragraphs of this

1    Complaint set forth above as if fully set forth herein.

2        107.    Defendants knowingly made, used or caused to be made or used, and

3    continue to knowingly make, use or cause to be made or used, false records or false

4    statements, material to an obligation to pay or transmit money or property to the

5    United States Government, or knowingly concealed and continue to conceal an

6    obligation to pay or transmit money or property to the United States Government,

7    or knowingly and improperly avoided or decreased, and continue to knowingly and

8    improperly avoid and decrease, an obligation to pay or transmit money or property

9    to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

10        108.    As a direct and proximate result of the above conduct by Defendants,

11    the United States has suffered damages and therefore is entitled to recovery as

12    provided by the FCA in an amount to be determined at trial, plus a civil penalty of

13    $5,500 to $11,000 for each such violation of the FCA.

## CLAIM FOR RELIEF

15        WHEREFORE, Relator requests that judgment be entered against Defendants

16    for treble the amount of the United States' damages to be determined at trial, and all

17    allowable civil penalties, fees, interest and costs under the False Claims Act and for

18    all other and further relief as the Court may deem just and equitable.

19        RESPECTFULLY SUBMITTED this _15th_ day of November, 2011.

20        **JENNINGS HAUG & CUNNINGHAM, L.L.P.**

22        By: _____
23        CHAD L. SCHEXNAYDER
         2800 N. Central Avenue, Suite 1800
24        Phoenix, AZ 85004-1049
         602-234-7830
25        cls@jhc-law.com

1

2

3

4

5

6

7

8

9

10

11  5500-0/ls

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**KLINE & SPECTER**
By: THOMAS R. KLINE*
    DAVID J. CAPUTO*
    DAVID C. WILLIAMS*
    1525 Locust Street, Nineteenth Floor
    Philadelphia, Pennsylvania  19102
    215-772-1000
    Tom.Kline@klinespecter.com
    David.Caputo@klinespecter.com
    David.Williams@klinespecter.com

**JOSEPH TRAUTWEIN & ASSOCIATES, LLC**
By: JOSEPH TRAUTWEIN*
    17 Auchy Road
    Erdenheim, Pennsylvania  19038
    215-764-230-1
    jtrautwein@cpmiteam.com

*Attorney for the Plaintiff-Relator*